932 F.2d 967
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Stephen BELLAMY, Plaintiff-Appellee,
v.
UNICOI COUNTY, TENNESSEE, Mike Hensley, and Sheriff Bob
Whitson, Defendants-Appellants.
 No. 90-5943.
 United States Court of Appeals, Sixth Circuit.
 May 8, 1991.
 
 Before MARTIN, RALPH B. GUY, Jr., and DAVID A. NELSON, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendants Mike Hensley and Sheriff Bob Whitson appeal from a denial of their summary judgment motion in which they claimed qualified immunity from suit. A magistrate denied the motion and this appeal followed.[1]
 
 
 2
 Upon a review of the record, we conclude the magistrate erred and we shall reverse.[2]
 
 I.
 
 3
 In his written opinion, the magistrate set forth, in a concise manner, the relevant facts:
 
 
 4
 The plaintiff, Stephen Bellamy, was employed by Southeastern Marketing, Inc. as a broker involved in magazine subscription sales. On March 29, 1988 he was arrested at his motel room at the Buffalo Valley Inn in Unicoi County, Tennessee. The arrest was made by defendant Mike Hensley and was based on a fugitive from justice warrant from the State of Mississippi.[1] The plaintiff alleges that after his arrest, several defendants questioned Samantha Denise Sabo, also an employee of Southeastern Marketing, Inc., about the activities of the plaintiff and other employees staying at the Buffalo Valley Inn. He alleges that on the basis of Sabo's statements, defendants obtained a search warrant for and subsequently searched his motel room. The defendants also obtained a warrant for the plaintiff's arrest and charged him with obtaining money by false pretenses and possession of drug paraphernalia, even though, plaintiff alleges, no contraband was found in the search of his motel room.
 
 
 5
 The plaintiff alleges that defendant Hensley's affidavit presented to support the search warrant and arrest warrant contained blatant falsehoods concerning the plaintiff and his business; that the defendants wrongfully relied on the information supplied by Sabo and should not have used her as an "informant" upon which to base probable cause for obtaining a search warrant; and that the defendants wrongfully failed to properly investigate, corroborate, or document their suspicions before arresting, searching, imprisoning, and instituting criminal charges against the plaintiff. The plaintiff further alleges that defendants Unicoi County and/or Sheriff Whitson had a policy of inadequate training in, among other things, the investigation or determination of probable cause to arrest or to request issuance of a search warrant. He argues that all of these actions caused a violation of his constitutional rights as protected by 42 U.S.C. Sec. 1983, specifically his right to be free of search and arrest based on information a reasonable officer should or would know was untrue, and the right to be free from false allegations in affidavits supporting search and arrest warrants. He seeks compensatory damages from all three defendants, as well as an award of punitive damages against defendant Hensley.
 
 
 6
 The defendants deny that they have violated the plaintiff's constitutional or civil rights. In their motion for summary judgment, they challenge the plaintiff's right of action, arguing that there was probable cause for their actions and that individual defendants Hensley and Whitson are entitled to qualified good faith immunity. Specifically, they argue that the Assistant Attorney General was present during the interview of Ms. Sabo and assisted them in preparing an affidavit in order to obtain a search warrant; and that defendant Hensley relied upon the Assistant Attorney General's instructions in regard to what material matters needed to be placed in the subject affidavit....
 
 
 7
 (App. 14-15).
 
 II.
 
 8
 The black-letter law relating to the qualified immunity of a police officer exercising a discretionary function in seeking an arrest warrant is well settled. "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable ... will the shield of immunity be lost." Malley v. Briggs, 475 U.S. 335, 344-45 (1986). Malley further teaches that our inquiry should be "whether a reasonably well-trained officer in [defendants'] position would have known that [their] affidavit failed to establish probable cause and that [they] should not have applied for the warrant." 475 U.S. at 345 (footnote omitted).
 
 
 9
 Against this backdrop we set forth the relevant conduct of Officer Hensley and Sheriff Whitson. Hensley first became involved while on duty on the night of March 30, 1988. He received a call from the dispatcher that a teletype had been received from Mississippi indicating that there was a warrant for the arrest of Stephen Bellamy on embezzlement charges and that the State of Mississippi would extradite. The dispatcher verified the teletype. Hensley, along with Officers Rogers and Calhoun, proceeded to the Buffalo Valley Motel where Bellamy was allegedly staying. The desk clerk verified that Bellamy was a guest, and Hensley proceeded to his room and informed him that he was to be arrested on the Mississippi warrant. Bellamy asked permission to make some telephone calls and was allowed to do so. Officer Calhoun stayed with Bellamy, and Officers Hensley and Rogers returned to the lobby.
 
 
 10
 While in the lobby, Hensley was approached by Samantha Sabo, who appeared to be in an excited state, and asked to talk with him. Sabo told Hensley and Rogers that she was working for Mr. Bellamy, and she was being held against her will. She also indicated that drugs were involved, and that people in the county were getting ripped off by fake salesmen working for Bellamy who were taking bogus magazine orders. Officer Hensley asked her if she would go to the District Attorney General's office and explain everything to him. She replied that if the Bellamy group saw her talking to the law that they would harm her. Hensley then offered to park his police cruiser in a place and manner so they could talk unobserved. At this point in time Sheriff Whitson arrived and was brought up to date by Hensley. In the presence of Sheriff Whitson and Officers Hensley and Rogers, Sabo indicated that she and the Bellamy group were selling magazine subscriptions but people were not receiving their magazines; that the group would move from county to county; that there were drugs in the motel rooms; and she was afraid they were going to harm her. Sabo was crying part of the time and was very convincing in her story. The sheriff decided that an assistant district attorney general should be consulted and Kent Garland was called and responded. Garland talked to Sabo for a "couple of hours," and she essentially repeated all she had told the other officers, as well as displaying multiple I.D. cards she had been given, and indicating that all of Bellamy's salespersons were given multiple I.D.s with different names. Garland found Sabo to be as credible a witness as he had ever interviewed.[3]
 
 
 11
 At this point in time, Garland felt he had adequate probable cause for a search warrant and spent an hour drafting the necessary papers. Sometime after midnight, a judge was called at home and authorized the warrant. Garland accompanied the officers on the search of the motel rooms. The search resulted in the seizure of drug paraphernalia, marijuana, and a schedule VII drug known as Rush or Lockerroom. There were also pictures of some of the salespersons in the apparent act of smoking marijuana and holding bags of marijuana. In Bellamy's room the officers found a corncob pipe that had an odor of marijuana and a device used to hold a marijuana cigarette while it was being smoked.
 
 
 12
 After the search, further investigation revealed that Bellamy did not have a legitimate business license or corporate charter in the State of Tennessee or the State of Florida as indicated in his papers. Garland directed that charges of possession of marijuana and drug paraphernalia and of obtaining money under false pretenses be brought against Bellamy. All 18 persons comprising the Bellamy sales group were arrested. At arraignment, upon motion of the State of Tennessee, all charges against these 18 persons, with the exception of Bellamy and three other individuals, were dismissed. The charges against Bellamy for obtaining money under false pretenses and possession of drug paraphernalia are the subject of an indictment by the Unicoi County Grand Jury are pending in the Unicoi County Criminal Court. Three of the group, Melinda Lovelady, Michael Daniel, and Colleen Foster, pleaded guilty to possession of drug paraphernalia.
 
 
 13
 A claim of qualified immunity presents a legal issue to be decided by the court. Therefore, our review of the magistrate's denial is de novo, just as it would have been if he had granted summary judgment in favor of the defendants.
 
 
 14
 In making a de novo review, we part company with the magistrate's analysis on two issues.[4] The magistrate places considerable emphasis of the fact that prior to the night in question, Ms. Sabo was an unknown quantity to the police. Although this is factually correct, we disagree that this calls into play the whole body of law relative to the reliability of informants as argued by plaintiff on appeal. Spinelli and Aguilar,[5] cited by the magistrate and relied upon by the plaintiff, have been supplanted by the "totality of the circumstances" analysis adopted by the Supreme Court in Illinois v. Gates, 462 U.S. 213 (1983).
 
 
 15
 Additionally, Sabo was not so much an "informant," as that term is referenced in cases such as Gates, as she was a victim reporting a crime to the police. In such circumstances, the test is whether a reasonably competent officer would have credited her story. Here, we have not one but three officers hearing the story and finding Sabo creditable. Even more significantly, we have an experienced assistant attorney general talking to Sabo for two hours and finding her completely believable. Again we emphasize that we are not talking about an anonymous tipster but one who had firsthand knowledge, which she delivered to the police eyeball to eyeball. Under such circumstances, we believe the police officers should not be subject to personal liability. Whether the rationale underpinning this conclusion is a finding of probable cause as a matter of law or the qualified immunity analysis of "objectively reasonable conduct," the result is the same.
 
 
 16
 We also conclude that the magistrate misperceived the issue of what "documents" were part of the probable cause calculus. The affidavit in support of the search warrant indicated that the police authorities had "documentation revealing an extensive conspiracy to obtain money by false pretenses, to wit: the collection of money from various citizens of Unicoi, Carter, Washington and Sullivan Counties for the purpose of magazine subscription with no intent to deliver said magazines." (Emphasis added). The only "documents" the police had in their possession were the ones taken from Ms. Sabo. These were: (1) a savings bond award certificate; (2) a short magazine list; (3) one picture I.D. card containing Sabo's handwritten name, address, etc., without the picture; (4) one unsigned dealer authorization card; (5) a fingerprint I.D. card for Ms. Sabo; (6) an expired press card with no connection to the plaintiff; and (7) another man's business card.
 
 
 17
 When Hensley was asked about the matter of documents at his deposition, the following colloquy took place:
 
 
 18
 Q. What documentation did Ms. Sabo have that revealed an extensive conspiracy involving these magazine people?
 
 
 19
 A. I don't know that either.
 
 
 20
 Q. Do you know that you swore in the Affidavit that she produced documentation ...
 
 
 21
 A. Yes, Sir, I did.
 
 
 22
 Q. Okay. Tell us--if you swore to it, I assume it was true, wasn't it?
 
 
 23
 A. I assumed it was. Attorney General wrote it out for me, what to write down on the Affidavit in his handwriting, and we had it typed off, and I signed it.
 
 
 24
 (App. 77-78).
 
 
 25
 We would make two observations relative to the language used in the affidavit in support of the warrant. First, the word "documentation" in context is not necessarily limited to referencing documents. One could speak of the evidence supporting the existence of a scheme to obtain money by false pretenses being "documented" by Ms. Sabo's firsthand account. Second, the language, if limited to actual documents, is overblown but not to the extent that one could conclude the warrant would not have issued if the "documentation" language had been omitted. The warrant affidavit was bottomed almost exclusively upon what the officers learned from Ms. Sabo, a good portion of which was subsequently corroborated.
 
 
 26
 It also should be noted that the police officers and Assistant Attorney General Garland had reasonable cause to believe that the Bellamy group intended to check out of the motel and leave town that night, which explains why the opportunity to conduct any kind of investigation, apart from what they learned from Ms. Sabo, was limited.[6]
 
 
 27
 Under these circumstances, we believe that Officer Hensley and Sheriff Whitson conducted themselves in an objectively reasonable manner and did not invade any constitutional rights of the plaintiff.
 
 
 28
 The denial of the motion for qualified immunity is REVERSED as to defendants Hensley and Whitson, and this matter is REMANDED for further proceedings consistent with this opinion.[7]
 
 
 
 [1]
 The parties had previously consented to an order of reference to a magistrate for all purposes including trial. 28 U.S.C. Sec. 636(c)
 
 
 [2]
 The magistrate's denial of the summary judgment motion filed on behalf of defendant Unicoi County was not appealed. Indeed, an interlocutory appeal was not available to the County. Mitchell v. Forsyth, 472 U.S. 511 (1985)
 
 
 [1]
 The plaintiff does not challenge the legality of the initial arrest based on the Mississippi warrant
 
 
 [3]
 Although one of the purposes of giving public officials the protection of immunity from trial is to avoid expensive and extensive discovery, in fact, the depositions of all relevant parties to this matter were taken, and this factual summary is garnered from these depositions, which were before the magistrate
 
 
 [4]
 The essential facts in this case are not in dispute
 
 
 [5]
 Spinelli v. United States, 393 U.S. 410 (1969); Aguilar v. Texas, 378 U.S. 108 (1964)
 
 
 [6]
 Although the defendant had other charges brought against him as a result of the search warrant being executed, the fact is that he already had been arrested and was being held under the Mississippi fugitive warrant at the time the search warrant was executed
 
 
 [7]
 We pass no binding judgment on the status of this matter as it relates to the only remaining defendant, Unicoi County. We note, however, that to the degree plaintiff's action is predicated upon a theory of inadequate training, it would appear that that theory no longer has any vitality since we have vindicated the individual officers